Sharriary v. Teledesic, is that a good effort, Sharriary? Iraj Sharriary, yes, that's a good effort. May it please the Court. Virginia Keeney on behalf of Appellant and Plaintiff Mark Sharriary. And with the Court's permission, I would like to reserve five minutes as rebuttal time. All right. Try to keep track of the five minutes yourself. I'll try to remind you, but I usually don't. Thank you. Your Honor, this case obviously presents many issues, and I'd like to focus on three of them. The first being the wrongful termination and violation of public policy claim. The second, his claim for discrimination on the basis of national origin. And the third being the fraudulent inducement claims. The third being what? The fraudulent inducement claims, which are pled as both fraud and negligent misrepresentation. Let me ask a question. It may not be at the heart of what's relevant, but I'm just curious. What was Mr. Sharriary, am I pronouncing that right? Yes, you are. What was his, like, income level at Hughes before he responded to the, you know, the entreaties or encouragement of McCaw's company Teledesic and came up to run Teledesic? Well, I don't think there's anything in the record in front of the Court on that. Okay. You've not been forgiven then. But I can answer it somewhat differently. In the record, there is evidence that he was the executive vice president and chief operating officer of Hughes Communications and Satellite in Los Angeles and that that was the position below president of Hughes at the time and that he was, in fact, in line or being groomed to be president of that company. A similar question, then, is there was some kind of a document, a settlement during the proceedings in which he accepted some kind of arrangement with the new employer after the dispute arose. What was the difference in income, if any, between those two arrangements? Well, he came back as an independent consultant. Yes. And I'm not sure if I can answer your question. The appellees make much of the fact that he was paid out on the terms of his contract to the tune of approximately $3 million. He was paid $20,000 a month for two years and he got a quarter of a million dollars or $2.5 million for the stock options, right? Yes. I believe that's correct, Your Honor. And the reason that he had that significant compensation package as part of the contract was because he was giving up a considerable income, stock options and benefit package at Hughes. It's not out of the generosity of Teledesic and McCaw's hearts that they paid that off. It was to entice him to give up. Does the record show an amount of forfeiture of stock options or benefits at Hughes? Because $2.5 million is a substantial amount and it may have been to offset something he had, but he may not have had $2.5 million there. Well, I don't want to misrepresent to the Court. I just want to know what's in it. If it's not in the record, it's not in the record. I don't know. I don't know. I apologize. It's not something that we were focusing on either at summary judgment or before us. It is my understanding, and I don't think Mr. Rice will disagree, though he may, that the compensation package that was negotiated was intended to compensate him for what he was losing at Hughes, which was a significant amount of money. It would look on his face like he's a high-paid executive at a high level in a major company. He's going to move to another major company. He's got a two-year commitment. As I understood it, there was a two-year term in the initial commitment, and they're making a very sweet enough deal to attract someone. But beyond two years, when people are dealing at those levels of sophistication and high levels in companies over such amounts of money, normally I would think the contract law would require he gets what he has spelled out. He doesn't get anything more than that, because if he wanted more than that, there are obviously ways someone making, who has a $3 million package, can negotiate to get a $5 million package or whatever. Then it's just a question of bargaining. So I wouldn't hold it against him that he got $3 million as to his claim if it's a valid claim. But at least on the contract aspect of the claim, it seems to me he's got real uphill burden to show he's entitled to anything beyond what the letter says. Well, Your Honor, as you may have noted, I did not raise the contract claim as one of the ones I intended to address. The district court found that it really was a moot issue because he felt that he had been fully paid on the contract. But your appeal covers it, doesn't it? Your brief covers it. It does. I'm sure I read in your briefing you were arguing contract. There is the issue of the bonus. And we argue that that additional bonus was something that was not paid under the terms of the contract. And so our brief on appeal was really just focusing on the unpaid bonus that had been promised to him. I don't see how you'd get much of a bonus if you worked for, you know, half a year and got paid out on your contract and hadn't really, you know, performed for the whole period. So at least from my perspective, I'm just one judge, but I have very little interest in the contract issue. I think the district court was right on that. I'm more interested in assessing the discrimination or misrepresentation claims. Well, the wrongful termination in violation of public policy, just so that I don't misunderstand the court, that is a tort claim. I understand that. It's not based on contract and that the damages that would flow from that if proven could exceed whatever was bargained for in the underlying contract. So, I mean, with the Court's permission, I was going to focus on the wrongful termination. Let me get to your three claims. Though if the Court would rather I focus on that. No, no. Go ahead to the three claims. Okay. With respect to that, the district court made in its order, I think, a misstatement of the state of the law of Washington with respect to that claim. The Court stated that he could not state such a claim without having proven that there had been an actual violation of the law by Teledesic or the other defendants. And that is not what needs to be proven under Washington law. The lead case is the Thompson v. St. Regis Paper Company case. I think it's the first Supreme Court case from Washington to address wrongful termination in violation of public policy. And in that case, the employee alleged that he had been terminated because he had simply tried to bring their accounting practices into compliance with the Foreign Corrupt Practices Act. There was no allegation nor evidence that any violation of the law actually occurred by the employer or any of its employees. And the Court in that case held that on those facts alone, it would violate the public policy of the State to punish someone who was simply trying to bring the accounting practices of a company into line with the law. The Court disregarded the Court below disregarded that opinion and instead, I believe, misread the Ellis decision, which was the next Supreme Court case out of Washington on wrongful termination. The Ellis case did not overturn or overrule the Thompson decision in any way. What the Ellis case set forth was a four-part test which we contend Mr. Sciari has met in this case. The first of that is that the plaintiff must prove the existence of a clear public policy. In the instant case, we briefed extensively the issue of breach of fiduciary duty by an officer, a director of a corporation under Washington law. Washington law is no different than under many states' laws. And what's the breach of fiduciary duty? I mean, I didn't see anything saying that, you know, they were stealing money at Teledesic or running some kind of big fraud or scam. What I saw was that they were planning some type of corporate reorganization with a new company called Newco. And Craig McCaw and Bill Gates allegedly were going to reorganize some way transferring their stock to that company. Well, the violation of their fiduciary duty that Mark Sciari raised with them in March was information that he had received from employees of the company. Employees came to him saying that they had learned that McCaw and Gates were planning on transferring their shares, basically making their shares in Teledesic publicly tradable by transferring them to a company where they would become stocks that had value, while leaving behind the shareholder employees in Teledesic with their shares which could not be publicly traded. And that was the issue that had a lot of the employees up in arms and very concerned. And that would be a breach of a fiduciary duty because it would put the director or the officer's own financial interest in getting publicly tradable stock above that of the other shareholders. I don't think it would be that simple. I don't think that would be per se. I mean, as I understand the law of fiduciary duty, that the mere fact of a reorganization that would have that end result would be a breach of fiduciary duty. It might be that in some circumstances it could be. It seems to me it's much more complex than that. Well, corporate transactions are complex. What was being explained to him was that by the employees, and when Mr. Sciari already met with McCaw, McCaw did not deny it. He just became furious and I said, I kicked Daggett out of Mr. Daggett, the former president, out of my office for raising concerns. Teledesic's treatment of its employee shareholders has resulted in a series of shareholder actions against Teledesic for actually ultimately putting into plan a slightly different scheme which raided Teledesic of its investment money and gave it to another company. But that's a different issue, and that hasn't been adjudicated, right? It has not been adjudicated. But did Mr. Sciari present something in writing to Craig McCaw that would be something like that we could assess exactly what he said would be a breach of fiduciary duty? No. The evidence on that is in Mr. Sciari's declaration, which I – which is part of the record, and in his deposition testimony. Okay. So he gave nothing in writing. He did go in to Mr. Sciari. What's the substance of what he said he said? The substance – He said he heard something from employees, and I said da-da-da-da-da. What was it? I'm paraphrasing for him that he had heard that employees were very upset because they had learned that Mr. McCaw and Mr. Gates were planning on taking their shares out of Teledesic, placing them in a new company which would be publicly tradable, leaving behind the employee shareholders with stock – not offering the same option to employee shareholders who would be left only with stock in Teledesic, with no ability to transfer it into the new company, which would be publicly tradable. And he said – As long as they didn't loot the assets of Teledesic, at least I don't see what – why that would be a breach of fiduciary duty, at least on its – there might be facts that would make it so. But just hearing it described that way, I don't quite get it, how, like, hearing that it would be a public policy problem if the guy is terminated. Well, in many of these companies, these sort of startup high-tech companies, employees were working for – on the belief that their shares would someday be publicly tradable, and that the directors would not take out 20 or 30 percent of the shares, make them publicly tradable, and leave them behind with stock that had no value because it couldn't be traded. Well, I would understand it if there was, like, some kind of plan that higher-ups had that said, we are never going to take this company public. We're going to form some other company, and all the profit is going to go to that, and no one's ever going to have a liquidity event. You know, we're never going to sell this company or take it public. No one who has stock options is ever going to get in. But that's kind of a far cry from some intermediate corporate reorganization. It might actually assist Teledesic if it helps it get financing or some – I mean, there's scenarios under which it would be good for Teledesic that that happened. Well, I think that Washington's law on the breach of fiduciary duty is – doesn't give you that kind of leeway, that the directors and officers cannot take a benefit for themselves and not extend it to the shareholders – It's a corporate benefit. To the other shareholders. And that was what he believed – I'm sure he already believed was contemplated at that time from the information in front of him, and that's what he raised with McCaw. I think if the Court looks again at the Thompson decision, the facts are comparable there. There was no – there was nothing in Thompson beyond that the employee who complained was trying to bring practices into compliance with some law. Compliance with law. Yeah. The difference in my mind – and I don't want to monopolize your time, but it's that trying to bring something into compliance with the Foreign Corrupt Practices Act, the law seems a little different than reorganizing a company in some way. But another way of looking at it, and this is what I think both Ellis and Thompson stress, is the public policy is, do you want to discourage employees from coming forward when they see these potential violations of the law? And so do we want to punish the president of a corporation for going to an officer or director and saying the employees are upset, they hear that you're going to make this deal that's going to exclude them? Do we want – it contravenes the policy of the State if the facts were proven that that was the motivation to permit a director or an officer to punish a president for having raised that. Okay. I would like to go ahead to the unlawful discrimination claim, because there is a significant omission in the district court's opinion that I think does need to be addressed. The – and I'm focusing on the national origin discrimination. I think it's a stronger claim, and the district court below acknowledged that. The court, although it makes mention of pretext, it doesn't consider any of the evidence of pretext which was submitted by plaintiff. Instead, the court goes off and starts talking about what was the nature of the direct evidence or the remarks that were offered. So there's no discussion at all of evidence of pretext. The court basically took it as true that there were significant problems with Mr. Schiari's performance. But I would like the court to – I just want to bring the court's attention to the parts of the record where we submitted evidence of pretext. First, and perhaps most significantly, five months after Mr. Schiari was terminated, he was given an unconditional offer to return as a president, saying, please return to your position as soon as possible and resume your responsibilities for overseeing the company's day-to-day operations. That was a letter sent to him by the CEO, and it appears that the record at 631. Certainly strong evidence that they did not think that he was incompetent to manage their business. Tren Griffin, there's a memo from him which appears at 630, which was written on March 31st, 1999. He's a key employee and confidant in the cause who described Mr. Schiari as the last, best hope to bring order out of chaos at the company. Mr. Weibling admitted in his testimony, which appears at the record at page 226, Mr. Weibling is basically the gentleman who told Mr. Schiari that he was terminated and is a director and key player in the Eagle River Teledesic companies. He admitted that he had never seen Mr. Schiari act abusively. He'd never seen him treat employees with anything less than respect. He never saw him fail to exercise good judgment or to display his considerable knowledge. There's considerable testimony also from Bill Owens, who was the co-CEO, former I think vice chairman of the Joint Chiefs of Staff, who had only very positive things to say about Mr. Schiari and their teamwork on negotiating the Motorola deal. There is also evidence from another key employee, Mr. Ratliff, which appears at 626 of the record, saying only very positive things about his relationship with Mark Schiari. And there's more, but it's listed in our brief. I just wanted to focus the Court on it. That evidence of pretext had to have been considered by the district court, and the court instead weighed the evidence and made credibility decisions, the two things that Reed's counsels, the district court, should not do in discarding that evidence. The district court also could have, on the basis of that evidence of pretext alone, found that there was enough evidence of discrimination to avoid summary judgment. What's the evidence of discrimination? I mean, the age discrimination, which you cover in your brief, I mean, he was hired. He was, what, 54 when he was hired, and he was 54 when he was fired. So if he's hired when he's 54, how does that support it's an age discrimination termination? I really don't get that. I don't think that's the thrust of the discrimination here. I think it's national origin discrimination. Okay. But you say it's not the same national origin when he was hired as when he was fired, too? Yes. But that one, there were actual discriminatory remarks made to him. It is not correct, as appellees suggest in their brief, that he said, McCaw said, you do things, people, differently at Hughes. The testimony of Mr. Sciariari at page 486 of the record is that Mr. McCaw said, you people do things differently than we do in this country. And also, on June 3rd, you know you can't be a CEO. What was it about Mr. Sciariari that made it that he couldn't be a CEO of a company that had 100 employees when he had been the chief operating officer of Hughes in charge of marketing, finance, and legal for 9,000 employees? The remarks by McCaw suggest that he felt that there was something about Mr. Sciariari, I believe his national origin, that prevented him from leading the company in that kind of visible role. Well, it's possible that he could have been hired for a position lower than CEO, even if he was a particular nationality, and that the person who hired him would not feel that he should be in the higher position of CEO. But let's assume that's true. Does that establish a claim here? Because the claim really isn't that he wasn't, well, I guess it is partly that he wasn't given the position of CEO. I mean, that would have to be. He was hired to be president. Well, maybe I can respond to all of these things. What I'm saying is that it's not a basis for saying, well, they would fire him because he was an Iranian or Middle Easterner. It would be a basis for saying that they wouldn't put him in the higher position because of that. And then your claim, then you'd have to say that despite what you mentioned, that he was hired to be president. He was really either hired to be CEO and then not given that or that somehow he was not promoted when he should have been. Well, yes and no. And this goes back to the point you were raising. Why would they have hired him to fire him? I mean, that goes to this whole issue of the same actor defense that the district court adopted. And the case we stressed was the Johnson v. Group Health Plan case out of either the Sixth or the Eighth Circuit. But its reasoning makes sense. Sometimes you do hire someone, even if you don't believe because of their race or nationality that they're going to go anywhere in their company. You hire them because you need something that they have. And then when you use them, you get rid of them. And Mr. Shariari, we contend, had something they desperately needed. Mr. McCaw had flown down to Santa Monica, tried to get him to come in as the technical person, to lead the technical team. When he rejected that, they had to go back down again and make promises to them, to him, which they did not intend to perform, to try to get him. Because they desperately needed his technical expertise and his experience. Teledesic, at the time he joined it, had never made. That's not like a contract theory that that they their whole contract was a phony deal or they didn't fulfill what they said. I mean, they said we give you two years, which isn't unreasonable, bringing someone in at such a high level. And, you know, you're in the stratosphere already. And I mean, there aren't that many jobs above president, their CEO and chairman of the board. And Craig McCaw is saying to somebody, you're not going to be CEO. It could just mean he's got someone else he wants to be CEO, I suppose. I mean, I don't I don't see how that supports an inference of racial discrimination. The you people sentence, I think, is some evidence, but I'm not seeing that you can't you're not going to be CEO as having much weight here. Well, I think the you people from other countries is a strong is more is direct evidence of discrimination. I don't think it's a stray remark. I think it's direct evidence from the decision maker around the time of the decision that at the time they were discussing the future of the company where he made a derogatory comment about him. The other comment, I think, with I think a jury could find that his statement, you don't have what it takes to be a CEO in light of Mr. Sharii's to be a CEO or to be CEO of Tel Aviv. The quote is, you know, you can't be a CEO. But clearly you're not saying that McCall was saying you can't be a CEO of any company in the world. I mean, you want to start your own. He's in context. He's saying you can't be a CEO here. Well, I think I think in a sense, we're making decisions about this that should have been left to it to a trier fact. Maybe if they're reasonable inferences. But who is that? Who was the CEO? Well, at the time it was, I believe, in the car was this Hopper. It was I think Hooper and Mr. Owens. Well, it certainly was. Mr. Owens is one of Mr. Owens had a military background. Oh, yes. OK. So he was CEO. He was called CEO. And why why Mark Sharii could not be co-CEO was the other CEO. I'm sorry. I apologize. I don't know. I thought it was Mark. You can't be a CEO and you people do things differently than we do in this country. How closely connected were they to each other? Were they the same conversation? I don't believe so. But did you know you can't be a CEO? Mr. Sharii testified was set on June 3rd, approximately one month before he was terminated. And that's at page forty five of the record. The the next conversation was just between him and the car. He places it in Washington, D.C. I'm not sure it's clear in the record when that conversation occurred. It's my reading it. I think it's it's a later conversation when he and McCall were together talking about the vision of the company. But I don't know. And what was the precise testimony of Mr. Sharii on the you people sentence? Was the you people in quotes, you people do things differently than we do in this country. And this was in the context of McCall telling him he didn't have a vision. That could be a compliment, too, if somebody did something better than. I mean, it depends in light of in light of the fact. I mean, at this point, McCall has forced basically given him only technical responsibilities. The one thing he said he didn't want to do. McCall has removed him from the Motorola negotiations, which Bill Owens, the CEO, who is the former second highest person in the United States military during, I believe, the Clinton administration, said that Mr. Sharii had done a remarkable job on it. McCall removed him from that role, basically had relegated him to no role and then terminated him. You know, soon after that, that doesn't seem like a compliment. Business people can do things like that for their own business purposes if they're not if it's not discriminatory. You know, if someone can hire someone to be president, say, I'll pay you to be president of this company that I am the major shareholder. And then. But if I don't like your approach to something. Cut it off. I mean, that that's legitimate. That's done all the time. The question is whether it was for some racial reason as opposed to some assessment of skills. At least as I see it as whether you have evidence of racial discrimination. The evidence we have are the remarks. The evidence we have is the evidence of pretext. And the Reeves case clearly says that that pretext alone can be sufficient evidence of discrimination even without direct evidence. And, you know, they their their claim is that he was a monster, a tyrannical monster. That and we have established that that was pretextual by evidence that they asked him to come back as president soon afterwards, and that many of the key people admitted in their depositions that they had had no problems with him and had not seen those things. So I think once that type of evidence is submitted, it really should be for the trier of fact to determine who's credible here. Is it Mr. McCall or Mr. Wibling who say he was a tyrant or is it Mr. Wibling in his deposition who said he had no problems with him? Well, they weren't treating him as such a like a tyrannical monster to use your term. I wasn't aware they used those terms in anything they either said to him or sent to him writing or verbally called him a tyrannical monster. But if they thought he was like doing things so badly that he was in material breach, I guess they would have tried to rescind the compensation. So obviously they didn't think he's such a monster that he wouldn't get paid out on the term of his two year contract. Well, they they they had had to submit their evidence of their justification for terminating. Which, as I understood it, was that his management style wasn't agreeable to a number of executives or people reporting to him. Well, I think it was wrong. They say he was a monster. I just realized that I didn't like to tell you that you were approaching the end of your term. We were way over. I've taken you over. And I'm sorry. Tyrannical, I think, is the word, not monster. So I think that's what they accused him of being. But we'll still give you a few minutes for rebuttal. Thank you. Good morning, Your Honor. Michael Rice. I represent all four defendants, Teledesic, Eagle River, Mr. McCall and Mr. Weibling. I would, with the court's permission, like to clarify a few of the facts that the court did have questions about. In the fall of 1998, Mr. Shariari was an executive vice president at Hughes. He hoped to become president. He was at the same time negotiating with Teledesic to become president. When he learned he had been passed over for president at Hughes, he then signed the contract with Teledesic. The contract, it was in the form of a letter agreement. The parties contemplated a full written agreement later on, which for some reason was never executed. But all of the terms of that contract were indeed fulfilled. Do you agree with Mr. Shariari's counsel that the record doesn't tell us exactly what he gave up in stock options at Hughes to join McCall? Correct. That's not in the record. And it's roughly correct that he received $20,000 a month for two years, plus his stock option agreement? Yes, it's not just roughly correct. It is correct. And I do want to clarify what happened in July. He was not terminated as an employee. That's clear. He was removed from the position of president. Mr. Shariari returned to California. At that point, Teledesic could say, did he quit? Could he argue constructive discharge? Did we have cause to terminate him? And Teledesic simply said, we will fulfill our contractual obligations. So he remained on the payroll, even though he was in California not working. What's wrong with his – I mean, the two arguments that are stressed the most in oral argument, and I realize we have briefing and other things, but it seemed that counsel stressed primarily the termination in violation of public policy under Washington law, and secondarily, or equally important or more important, the idea that he was terminated because of his national origin. With regard to the termination in violation of public policy, first of all, he was not terminated as an employee. The matter that he was objecting to was simply a discussion of a possible corporate reorganization. At that point, Mr. McCaw and Eagle River had interests in some publicly traded companies, Nextel, Nextlink, some non-publicly traded companies, and there were discussions about ways that it might be possible to bring these companies together. Does the record say what Eagle River is? That's a shareholder. Is it also – is it like a McCaw company? The record does not have Mr. McCaw's interest in Eagle River. Eagle River is an investment company for a variety of – for a number of McCaw people. It had a 20 percent ownership interest in Teledesic. But there were simply discussions about potential corporate reorganizations. None of them ever took place. Many people objected to them. They were all speculative. In Washington, the termination of violation of public policy requires, one, a violation of a clear mandate of public policy. And I would point out that in Washington, the legislature has never created a private cause of action for whistleblowing, public employees who complain about wrongdoing are protected. But the Washington legislature has never extended whistleblowing statutes to the private sector, and we would urge this Court not to do so either. But there requires – there must be a clear evidence that the person is complaining about something which would violate a clear mandate of public policy, which we don't have in this case. Well, do you agree with Appellant's characterization that Mr. Schiariari complained to Mr. McCaw that reorganization to transfer McCaw and Gates' shares to a new company would be a breach of fiduciary duty to other shareholders? We agree that at some point Mr. Schiariari and many other people expressed many reservations to Mr. McCaw. Mr. Schiariari's were, he thought that this proposed reorganization, as he understood it to be, which never went into effect, might prejudice people at Teledesic. He said that. There's no evidence that when he said that, which was apparently in early March because the plan was pulled off the table in late March, there's no connection between his saying that and his removal as President in July. If I may, Your Honor. I want to be a little more specific. Sure. Because there's nothing in, that's why I asked if he had presented something in writing. It's one thing to say this may prejudice some other people or people may not like it or people are complaining. It's another to say, it may be another to say this plan, if implemented, will be a breach of your fiduciary duties. Did he say the latter? There's no evidence that he did. There was a general. My understanding is that he simply complained that it would be detrimental to the interests of people at Teledesic. I don't believe he said that it would be a breach of fiduciary duty. May I address to you, people, comment? I think I'm, I would call to the Court's attention the words of Mr. Schiariari in his own deposition. I'm looking at the excerpts of record submitted by the appellant at page 410. There was a discussion in a hotel in Washington, D.C., early in the spring. There was a discussion about Teledesic strategic planning or long range vision. And what Mr. Shari said was he told me that, quote, one has to be more patient, period. We can't do it this way, period. And maybe you people do it some other ways. You people, but we don't do it here, period. I don't really remember the context and details of it. There's no mention of another country. There's a vague statement about you people do it differently, which Mr. McCaw has testified meant you people at Hughes do things differently. Mr. Shari came in in response to the summary judgment motion and had a refreshed recollection of what he claimed Mr. McCaw said in that hotel room, where they were clearly discussing long range planning and vision. I'm not sure that it's a material difference. But on the previous page, again, Mr. Shariari says in one of those meetings, he used the word that you people do things differently than we do in this country or something to that effect. So in the passage you read, this country doesn't show up. Right. Earlier, it does. Yes. In both cases, of course, Mr. Shariari is commendably clear that he can't really remember either the detail or the context and detail and that he is paraphrasing or summarizing. That's exactly right. And the reason I went to the second page is because in the first page he – The reason you went to the second one was it didn't have his country in it. Well, it's because I was pressing him in the deposition. He first said, Mr. McCaw presumably made this remark about people in this country. And then I asked him to tell me exactly what he said. And then he went on and gave what I think is his best recollection on the next page. But he also admitted, as the Court points out, that he couldn't be entirely sure. Could you read the second one again? The one on the – when you pressed him as he's – It reads, quote, One has to be more patient, period. We can't do it this way, period. And maybe you people do it some other ways, you people, but we don't do it here, period, quote. Why would anybody think he's talking about youse? That's what Mr. McCaw's recollection is of the conversation. But what would give somebody listening to that? I mean, you people could mean short people, tall people, somebody who went to Yale, somebody who went to youse. Why would it mean people who were from youse? Was there anything prior to that in the conversation? One of the issues, one of the threads is that Mr. Shariari was continually doing things in a way that people at Teledesic thought was different. He came from a very large organization that was hierarchical. Teledesic was a start-up company with approximately 100 people, no offices, flat organizational structure. And people felt that Mr. Shariari was locked into a way of dealing with people that he had done. I can understand that argument or that analysis or saying that to somebody, you know, that people at large companies do it differently. You know, with your experience, you have a different approach. But you people wouldn't mean to me somebody from youse corporation. I hadn't had to think of them as a class of people that you say you people. But I wondered whether there was something that might. I understand Mr. McCaul said that afterwards. Is there any further to judge Ryan's question? Is there anything in the record about like the corporate culture of Hughes as compared to Teledesic? There's some of the people who were having problems with Mr. Shariari. And I think the court is quite right. No one contends that he was a monster, but there were there were a lot of problems with the way he treated people. And I came from use that was a culture of use because they treat people badly. Perhaps because he was Iranian or what was the reason? You know, perhaps people at Teledesic may have thought so. I think it was mostly that he was treating people. You know, he expected to be treated as if he was the boss in a way that was foreign to the way people at Teledesic felt at Teledesic. People didn't have offices. Admiral William Owens, who is the vice chairman of the Joint Chiefs of Staff. You know, I can understand completely all of that. People at Teledesic don't have this culture. People at Teledesic don't behave this way. But, you know, I'm just trying to understand what it means when you say that you people do it differently. I guess it's a question of. This is the way in response to Judge Reinhart's inquiry, I would like to know what the record shows. You know, this about these companies, if it does, because there are companies where an executive at some level has a big corporate office and they're like the president. And someone can't walk in on them and they've got to be screened. You know, and there are other corporate offices where everybody sits in cubicles and nobody has a different office. You know, there are just different ways people organize a business. Well, for example, if we were having a court meeting and I said to Judge Gould, you know, you people handle things differently. Now, I might be saying you came from a large law firm. That's the way they do it in a large law firm. But when I said to him, you people, I don't think you would naturally think that's what I'm talking about, unless in the conversation. Now, if Judge Gould happened to be black and I said to him, you people, it's even less likely he would think that I was talking about the fact that he had the misfortune to be in a corporate law firm before he came here. If I may, Your Honor, the motions for summary judgment were granted on the very eve of trial after all discovery had been completed, the parties had testified and all witnesses had testified. You know, the standard that the district court was operating under was the standard set by the Supreme Court in Reeves v. Sanderson-Plumbing, that is, whether a rational juror could find on this set of evidence that there was discrimination. And the district court properly concluded not. And I would say in Reeves, the Supreme Court says that, for example, when there is extremely weak evidence of pretext and abundant evidence of a reason for the company's decision, then the district court properly grants summary judgment. And that is the standard that Judge Kuhnauer was operating under. The problems that Mr. Shariari was having, that he was abusive to some people, that some people were threatening to quit, were reported to Mr. McCaw and were a basis for concern. There was a straw that broke the camel's back at the end of June. Teledesic was negotiating a multibillion-dollar contract with Motorola. There was a break-the-company contract that would have involved huge payments. On June 23rd, just before signing the contract, Mr. McCaw had Mr. Shariari in his office and said, is this contract acceptable? Can we go with it? And Mr. Shariari said yes. On June 30th, the Motorola contract was signed. On July 1st, Mr. Shariari went back to Teledesic, called a meeting of senior staff and said, if you think we had problems before, we have problems now. He was reported to have said by one of the participants, I wouldn't have my money in this company now. That was a huge problem for Mr. McCaw. Mr. Weibling then went and talked to Mr. Shariari, and based on the cumulative problems that had been happening in this final event, which is, by the way, acknowledged by Mr. Shariari in his deposition, it's at page 404 of the excerpts of record where he says, if you think we had problems before, we certainly do now. What's the timing of that compared to the motel room? You people comment or that it's impossible to tell from the record when that earlier comment was. It was sometime earlier. It was sometime during the spring. We don't have a date on it. It was at least a few months before that. It was at least sometime before. So in the face and then Mr. Weibling met with Mr. Shariari. They discussed finding another position for him. Mr. Shariari stormed out. There were questions about whether he had abandoned the job or not. He was removed as president. But the point is, he was not terminated as an employee. Well, after the I'll just call it the you people comment. What what were the responsibilities that Mr. Shariari retained subsequent to that discussion? He was still the president of the company. By his own testimony, he met with Admiral Owens. I'm pointing to page 398 of Mr. Shariari's deposition. He said that, by the way, the court asked who were the co-CEOs. The co-CEOs were Admiral Owens and Craig McCaw in the spring after Steve Hooper went off to a different company. So those are the two co-CEOs. Owens agreed and Shariari agreed that Owens would concentrate on external matters. And Shariari would run the Teledesic's quote day to day operations. That's precisely what he was hired to do. And that's what he did throughout that time. When the problems surfaced with disputes with Mr. Owens, with abusive behavior and the final straw in the Motorola contract, the decision was made to remove him as president. In that context, the hotel comment by Mr. McCaw, which has to be ambiguous at best, must be considered the type of stray remark that this Court has said, in other cases, is not sufficient to warrant an overturning of a judgment as a matter of law. The evidence that in this circuit under Nesbitt v. PepsiCo and other cases, those kinds of stray remarks, even a remark that we don't like people with gray hair or there are too many people of that nature around, even a remark that's less ambiguous is not given sufficient weight to warrant. Just the question is, what's the quality of the evidence that shows, assuming we interpret that remark as advanced by the appellant, what evidence is there that shows it has a causal relation to the term, to the, it wasn't really a termination. As you explained, it's sort of the change of responsibility. It's basically like shelving him, right? Well, he was removed as president while they tried to explore other positions. He remained on the payroll. He was invited in December after we'd been paying him nearly $20,000 a month. We still have the position open. We have not filled the position of president. Are you going to come back or not? Ultimately, an independent contractor agreement was negotiated with him. Your Honor, we have, for the Court's convenience. Is that agreement in the record, by the way? Excuse me? Does the record tell us, like, what the compensation was in the terms of the independent contractor agreement? It is in the record, but there, and for the Court's convenience, I can leave it to the clerk and pass up. There are two key documents. The letter that was sent to Mr. Shariari in January, which he signed on January 8th, and the independent contractor agreement, which he signed in May of 2000. They're both in the record of the court below. For odd reasons, neither of them made it into the ERs or the SERs. In the ERs, the appellants submitted an unsigned version of the letter. I have the signed version here. In the SERs, the independent contractor agreement was attached to Teledesic's answer. It is in the record below. It didn't make it into the SER. I have them. These are the two key documents, and they're available for the Court to look at, should you want them. Summing up, Your Honor, we think, or it's our position, that with regard to the public policy claim, there was no evidence of a violation of something that would be considered a clear mandate of public policy. You know, any connection between Mr. Shariari's simple remark in the early spring and the decision to remove him as president, with regard to the discrimination claim, where the same people hired him as president with an extremely lucrative contract, he was paid $3 million for less than six months of work, and they then made a decision based on ample evidence to remove him from that position later on. The evidence of pretext is so weak that the Court was properly concluded that summary judgment was warranted. If there are any other areas you would like me to address, I shall. Thank you, counsel. May I pass up these two documents? They are in the record below. They're not in the ERs. Why don't you just give them to the clerk? Counsel, have you seen these? I have. We have no objection. Okay. That would save us finding them in the record. Thank you, counsel. One minute? Yes. I said we'd give you a few minutes, if you like. Yeah, I'd be interested in hearing a few things from you. With respect, he did, I think, clear up some of the factual issues, but some of them, I think, remain problematic. One is, it is a disputed fact what was said in the meeting when he was terminated. Mr. Wibling claims that he didn't terminate him. Mr. Sciari's testimony is that he was told that he was terminated. And in fact, an e-mail went out the next day saying that Mr. Sciariari was leaving the company, not that he was being transitioned somewhere else. He was leaving Teledesic. Later, McCaw said, well, that wasn't an authorized e-mail. I didn't mean to send that out. But nonetheless, there is a tribal issue of fact about what was said to him at his termination. Everyone agrees at this event that Appellant says at the termination he was relieved of his President's duties, right? I think everyone agrees with that. There's no dispute about that. Everyone agrees that although he was relieved of his President's duties, he was still paid the compensation on the two years. So he lost some position. He kept the money. He lost the future, maybe, with the company. The question I have is the same one I asked your opposing counsel. Assuming that we interpret the you people comment to have some racial connotation in it, or that we feel that that's a fact issue for a jury to interpret, what is the evidence of a causal relationship between that and this downgrade in his title or responsibility? The shift of, you know, the event that you call termination and they call shifting him out of the presidency. What's the causal relation? Because it seems that from what I've seen or heard, that subsequent to that comment, he continued. He was still President. He had the significant responsibilities on the Motorola contract. What happened differently after? What's the causal relationship? The causal relationship is that. The evidence of that, as you see it. As we see it, the evidence is that he was removed from the Motorola deal basically in late March. And after that, there was basically nothing for him to do because he had done what they wanted him to do, which was to finalize a deal which they didn't have the expertise to do. And Owens acknowledged that, that there was no one who had the ability to or the expertise to negotiate that deal. It was a, I mean, to actually put a hundred or more satellites into space was an enormous undertaking. And Owens acknowledged that they needed Shariari to come in with his technical expertise, that he'd gained at Hughes to actually make that happen. Assuming that story is the true story, I don't see how the firing then turns into a national origin-based firing. It turns into a very cynical exploitation of particularized knowledge and an immediate firing after the, I mean, they squeezed it dry and throw it away. Boom. That's a perfectly sensible, perfectly cynical, maybe or maybe not true explanation. But even if true, I don't see where national origin comes in. Well, we have, we do have three alternative motives. One is that there was a fraudulent inducement to get him there so that they could use him in this manner. One is that they terminated him after he raised the complaints about this attempt to do this stock swap. And one is that they had never intended really to give someone of his national origin true responsibilities to lead the company. That was going to be left to someone like Owens and the other Caucasian gentlemen who lead Teledesic. Well, it could be that they'd want someone who was like a big, big military person to be the head of a company that that requires government cooperation and launching satellites. I mean, that that might be rational on behalf of the company. But but they never. That's not really the issue. We're not comparing him to Owens. We're saying that they did not give him what was promised to him and they didn't even give him the significant responsibilities of a president. We're not asking this court to compare him to Owens in terms of who should have been, you know, the only senior. It's our job that we have the either the skill or the commission to make assessments of whether, you know, a brilliant executive or a retired admiral or whatever should run a company that that's kind of in the corporate sphere. The bottom line, in my mind, and I think in the court's mind should be, is are these issues that should be left to a trier of fact or should it be taken away and decided by the court? In addition to the the evidence of animus from the call, there also were there was the testimony from Weibling that he and Dennis James were made uncomfortable by the fact that Mark Shariati made notes in Farsi and he Mr. Weibling and the court decided below that that meant that Mr. Shariati was disengaged. But a reasonable inference also could be drawn that Mr. Weibling and Mr. James were in fact made uncomfortable by the fact that he was thinking in a different language. And there are really two two conclusions that could be drawn from those statements by Weibling and McCaw. How many how long did he live in with in Iran with that as his with Farsi as his principal language before he came to the United States to work? He came to the United States, I believe, for college when he was 18. OK. Well, I mean, I think I'm no big expert in this, but I would think a lot of people would assume someone who spent their youth in a certain country would maintain at least both languages. They they'd use both languages. Right. They must have known that he might think in Farsi. I mean, I find it hard to believe the company would be discriminating against them for taking notes in Farsi. I'm just presenting the testimony of the decision maker. Mr. Weibling was that he was made uncomfortable by the fact that he wrote in Farsi or in a foreign language. I don't Mr. Weibling said he didn't know what it was and that Dennis James, who was counsel also, it made him uncomfortable. He Mr. Weibling said that he was writing. I don't think we should assume too much sophistication or knowledge of international affairs on the part of corporate or other executives. Well, company could have a policy that they want business notes and business communications to be in the language. That's the official language of the company. So, you know, like if a lawyer has a file and the lawyer is sick and isn't there, someone else can refer to the notes and so on. But there's no evidence of that. I mean, this is. They never said he told me to do it in English. They just said they were uncomfortable. Exactly. So we're not disputing a policy if there was one. We're just saying these are the little pieces of evidence that reveal their true feelings towards Mr. Weibling.      Yes, I do. And I'm not sure whether you believe a trier fact could determine were harbored a discriminatory animus towards him. Okay. Thank you very much. Thank you both very much. The argument case just argued will be submitted. I think it'd be good to take a brief recess before the final case of the morning. Thank you.
judges: Reinhardt, W Fletcher, Gould